UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANK SHUMAN and MARTHA SHUMAN, his wife,
Plaintiffs

v.

REMTRON, INC.,
Defendant/Third-Party Plaintiff

v.

FRIEDMAN ELECTRIC SUPPLY COMPANY, a/k/a FRIEDMAN ELECTRIC SUPPLY CO., INC.,
Third-Party Defendant/Fourth-Party Plaintiff

v.

J.L. SOUSER & ASSOCIATES, INC.
Fourth-Party Defendant

**CIVIL NO. 4:09-CV-00003**

(Magistrate Judge Smyser)

**MEMORANDUM AND ORDER**

This is products liability action involving a remote control system for cranes, and involving two cranes and two

remote control units. We conclude that the defendant is not entitled to summary judgment on the plaintiff's claims. But we conclude that the third-party defendant is entitled to summary judgment on the defendant's claims of indemnity and contribution and that, in turn, the fourth-party defendant is entitled to summary judgment on the third-party defendant's claims of indemnity and contribution.

I. Background and Procedural History.

The plaintiffs, Frank and Martha Shuman, commenced this action by filing a complaint against Remtron, Inc. Plaintiff Frank Shuman was injured in an accident involving a crane[1] on January 10, 2007. The movement of the crane was controlled by remote control units that were manufactured by defendant Remtron. The plaintiff[2] alleges that the accident occurred

1. For the sake of clarity, the crane that caused the injury to the plaintiff will be referred to in this Memorandum as the "Shuman crane."

2. References to the plaintiff in the singular are references to plaintiff Frank Shuman.

when he turned off the remote control unit[3] that he was using and a coworker, Dale Weaver, intending to operate a different crane[4], used a separate remote control unit[5] to operate the Shuman crane. Weaver released the load of steel that the plaintiff was working with, and the plaintiff was seriously injured when steel fell against him.

The complaint contains four counts. Count One is a claim based on strict liability. Count Two is a negligence claim. Count Three is a failure-to-warn claim. And Count Four is a loss of consortium claim by plaintiff Martha Shuman.

Defendant Remtron filed a third-party complaint against Friedman Electric Supply Company seeking indemnity and contribution. Friedman Electric in turn filed a fourth-party complaint against J.L. Souser & Associates, Inc.

---

3. For the sake of clarity, this remote control unit will be referred to herein as the "Shuman remote."

4. For the sake of clarity, this crane will be referred to in this Memorandum as the "Weaver crane."

5. For the sake of clarity, this remote control unit will be referred to herein as the "Weaver remote."

The parties consented to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c). The case is scheduled for a pretrial conference on March 15, 2012 and a jury trial beginning on April 2, 2012.

There are three motions for summary judgment pending: a motion by defendant Remtron, a motion by third-party defendant Friedman Electric, and a motion by fourth-party defendant J.L. Souser.

II. Summary Judgment Standard.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With

respect to an issue on which the nonmoving party bears the
burden of proof, the moving party may discharge that burden by
"'showing'-- that is, pointing out to the district court --
that there is an absence of evidence to support the nonmoving
party's case." *Id.* at 325.  Once the moving party has met its
burden, the nonmoving party may not rest upon the mere
allegations or denials of its pleading; rather, the nonmoving
party must show a genuine dispute by "citing to particular
parts of materials in the record, including depositions,
documents, electronically stored information, affidavits or
declarations, stipulations (including those made for purposes
of the motion only), admissions, interrogatory answers, or
other materials" or "showing that the materials cited do not
establish the absence . . . of a genuine dispute." Fed.R.Civ.P.
56(c).

Summary judgment is not appropriate when there is a
genuine dispute about a material fact. *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if
it will affect the outcome of the trial under governing law.
*Id.*  A dispute as to a material fact is "'genuine' only if a

reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson, supra,* 477 U.S. at 249-50. In determining whether a genuine issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter, but it is to determine whether there is a genuine issue for trial. *Anderson, supra,* 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining

whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.” *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial. *Celotex, supra*, 477 U.S. at 322. “Under such circumstances, ‘there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party’s case necessarily renders all other facts immaterial.’” *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex, supra*, 477 U.S. at 323).

III.  Material Facts.

The following facts are not in dispute for purposes of
the summary judgment motions.[6]

At the time of the accident on January 10, 2007, the
plaintiff was employed by Bouras Industries as a crane
operator/stock chaser. *Doc. 69* at ¶12.  Bouras had fifteen to
seventeen cranes in its factory. *Doc. 72* at ¶30.  The plaintiff
had worked in the building that housed the cranes for 22 years.
*Id.* at ¶28.

In the past, Bouras operated its overhead cranes by
having its employees control the cranes from the cabs of the
cranes. *Doc. 69* at ¶17.  In 2005, Bouras decided to change over

---

6. These facts are a combination of facts taken from the
statements of undisputed facts filed by Remtron, Freidman
Electric, and J.L. Souser.  We have not included facts which any
of the parties properly dispute in accordance with Local Rule
56.1.  But we have included facts which, although a party
purported to dispute, were not properly disputed in accordance
with Local Rule 56.1.  For example, where a party purports to deny
or to dispute a fact but does not include a citation to the record
that supports such a denial or dispute, we deem the fact
undisputed.

to having the cranes operated by remote control. *Id.* at ¶18.
To effectuate the changeover, in June of 2005 David Masser, the
Maintenance Supervisor for Bouras, contacted Tom Spangler of
Friedman Electric. *Id.* at ¶¶13 & 20.

Spangler and Masser met at Bouras for approximately
fifteen minutes to discuss the changeover from the cab-operated
format to a remote control format. *Id.* at ¶22.  Spangler
brought the only Remtron catalog that he had to the meeting
with Masser. *Id.* at ¶24.  Masser reviewed the Remtron catalog,
but the catalog did not contain a suitable remote control. *Id.*
at ¶¶25-26.  So Spangler contacted the local manufacturing
representative of Remtron, Carson Heistand of J.L. Souser. *Id.*
at ¶27.

Spangler, Masser, and Heistand met to discuss whether
Remtron manufactured a noncatalog remote control that would
satisfy the needs of Bouras. *Id.* at ¶28.  Masser explained the
specific needs of Bouras. *Id.* at ¶29.  Heistand informed Masser

of the Pitch and Catch option[7] and the First Come, First Serve option[8] available in the remotes manufactured by Remtron. *Id.* at ¶30. Spangler was not aware of these options offered by Remtron until Heistand explained the terms to Masser. *Id.* at ¶31.

Before he could determine which Remtron remote control, if any, would satisfy the needs of Bouras, Heistand had to obtain certain information, such as the number of cranes involved, the number of speeds, the number of motions, the number of operators, and the voltage. *Id.* at ¶¶32-33. On May 17, 2005, Heistand and Masser spoke via telephone. *Id.* at ¶34.

---

7. Under the Pitch and Catch option, one crane is operated by two operators. Heistand described the Pitch and Catch option as follows:

> Pitch and catch is one crane – usually with a long runway there will be an operator at one end and an operator at the other end. The operator at one end will pitch the crane to the other second operator, and he will catch it.
>
> In other words, the first operator has control. He'll send the crane down to the second operator, and he'll press a button on his transmitter to access the control.

*Doc. 95*-7 at 9-10 (Heistand Dep. at 29-30).

8. Under the First Come, First Serve option, "[i]f you have two transmitters operating the same receiver, the first one that turns their transmitter on has control of the crane." *Doc. 95*-7 at 9 (Heistand Dep. at 29).

As a result of this telephone conversation, Heistand obtained all of the information he needed to "quote" the appropriate Remtron remote control for Bouras. *Id.* at ¶¶41 & 91. Based upon the information provided by Masser, it was clear to Heistand that Bouras wanted two separate remote controls each of which would have the capability of operating two separate cranes. *Id.* at ¶42.

After speaking with Masser, Heistand contacted Hal Boult from Remtron. *Id.* at ¶43. On May 24, 2005, Mr. Boult sent a facsimile to Heistand informing Heistand of the specific Remtron remote controls (21T20), the specific receivers (21R22) that should be purchased by Bouras, and the prices for those components. *Id.* at ¶¶45, 46 & 49. Boult included a "Configuration Sheet" that provided a picture of the 21T20 remote control as well as the specific configuration of the remote. *Id.* at ¶48.

Heistand then sent an email to Spangler informing him of the specific equipment Remtron recommended for Bouras. *Id.* at ¶53. That email explicitly informed Spangler of the

specific remote controls and receivers that should be purchased, the prices of the components, and that the Pitch and Catch option would not work for Bouras but that the First Come, First Serve option would work. *Id.* at ¶¶53-56. Heistand believed that Spangler would simply order for Bouras the remote controls and receivers that he had identified in the email. *Id.* at ¶59.

On May 25, 2005, Heistand faxed to Spangler the "Configuration Sheet" that had been provided to him by Boult. *Id.* at ¶60. Later on May 25th, Spangler drafted a Quotation to Bouras. *Id.* at ¶61. The Quotation was based solely upon the information provided by Heistand in the May 24th email. *Id.* at ¶65. Spangler provided the Quotation to Masser, and Bouras agreed to purchase the equipment. *Id.* at ¶¶67-68. On June 24, 2005, Spangler prepared a Purchase Order for the equipment. *Id.* at ¶69.

On June 28, 2005, Heistand sent Spangler a facsimile informing him that the purchase order needed to be revised because it overcharged Bouras for a spare remote. *Id.* at ¶72.

Friedman Electric sent a revised purchase order to Remtron, but the revised purchase order ordered 21T18 remote controls instead of 21T20 remote controls. *Id.* at ¶73. As Friedman had ordered the wrong equipment, Heistand contacted Spangler and specified the proper equipment that had to be ordered for Bouras. *Id.* at ¶76. Specifically, on August 5, 2005, Heistand sent Spangler a facsimile directing him to return the 21T18 remotes and order 21T20 remotes. *Id.* at ¶77. That facsimile also directed Spangler as to what options had to be ordered with the remotes, and it included a "Configuration Sheet" detailing the layout of the remotes. *Id.* at ¶¶78-79.

Friedman subsequently sent a new purchase order to Remtron ordering the exact equipment detailed in Heistand's August 5th facsimile. *Id.* at ¶80. That equipment was the same as Boult had originally recommended and that Heistand had identified in his May 24th email. *Id.*

Remtron performed the programming of the equipment purchased by Bouras. *Id.* at ¶86. Neither Spangler nor Friedman Electric programmed the equipment or performed any testing on

the equipment. *Id.* at ¶¶87 & 89. Friedman Electric's internal policies prohibited Spangler from performing any services other than processing sales. *Id.* at ¶92. The only role of Spangler and Friedman Electric in the purchase of the remotes was to process the sale. *Id.* at ¶94.[9]

The remotes and receivers were installed by Bouras. *Id.* at ¶95. Each of the remote controls was able to operate either of two separate cranes. *Id.* at ¶100. There was a "CRANE SELECT" knob that allowed the user to select between crane 1 and crane 2. *Id.* When a remote control is turned on to a particular crane, a horn (alarm) would automatically sound, and, while the crane is moving, a whistle would also go off. *Id.* at ¶¶103-104. When the remote control is turned on to activate a crane, a red, blinking light would light on both the remote control and on the crane. *Id.* at ¶105. The purpose of

9. Remtron failed to respond to this statement of fact in Friedman Electric's Statement of Undisputed Material Facts. We note, however, that Remtron does argue in its brief that Friedman Electric did more than merely process the sale. We address that argument in the discussion section of this Memorandum and Order.

the lights is to provide to the employee a signal indicating the crane that the employee is controlling. *Id.* at ¶106.

The First Come, First Serve option was included with the remotes to ensure that two separate remotes could not simultaneously operate the same overhead crane. *Id.* at ¶97. The First Come, First Serve option ensures that the first remote that is turned on will have control of the crane and that, as long as that remote control remains on, no other available remote control is able to also operate the same crane. *Id.* at ¶98.  Under the First Come, First Serve system, a remote control has exclusive control over the crane when the remote's power is on, but when that remote is turned off the second remote control can operate the crane. *Doc. 72* at ¶4. The First Come, First Serve option is a safety feature offered by Remtron. *Doc. 69* at ¶99.  The First Come, First Serve option as well as the 21T20 remote and 21R22 receiver were offered for sale to the public by Remtron and were specifically referred to in Remtron's user manual. *Doc. 81* at ¶55.

The plaintiff began working as a crane operator/stock chaser approximately seven months prior to the accident. *Doc. 69* at ¶108.  Prior to the accident, he had been trained on how to operate the remote controls. *Id.* at ¶109.  The plaintiff understood that the power to the remote control must be on to prevent the crane from being operated by another remote control. *Doc. 72* at ¶7.  He understood that turning the remote control off would allow another operator to take control of the crane. *Id.* at ¶8.

The plaintiff's position required him to climb into storage bins to hook up bundles of steel and then cut the steel bands from the bundles. *Doc. 69* at ¶119.  On the day of the accident, the plaintiff used the Shuman remote to move the Shuman crane to get a bundle of steel. *Id.* at ¶123.  He then climbed into a storage bin and hooked up a bundle. *Id.* at ¶124. He lifted the bundle up halfway, put the Shuman remote down on the bundle, and started cutting the steel bands. *Id.*  He turned the Shuman remote off. *Doc. 72* at ¶15.

At the time the plaintiff was in the storage bin cutting the bundles, his co-worker Dale Weaver was planning to activate the Weaver crane with the Weaver remote. *Doc. 69* at ¶126. Before pressing the start button on the Weaver remote, Weaver did not look at the "Select Crane" knob to confirm that he was controlling the Weaver crane. *Id.* at ¶128. The "Select Crane" knob was, although Weaver did not know it, set to control the Shuman crane. Weaver heard the whistle blow as soon as he hit the start button on the Weaver remote. *Id.* at ¶130. Shortly after hitting the start button, Weaver hit the bridge button on the Weaver remote, thereby inadvertently causing the Shuman crane bridge movement. *Id.* at ¶131. The Shuman crane bridge movement caused the release of the bundle of steel that the plaintiff was cutting in the storage bin, pinning the plaintiff against a ladder. *Id.* at ¶133.

As a function of the design of the remote controls, if the plaintiff had kept the Shuman remote turned on, Weaver would have been prevented from connecting to the Shuman crane. *Id.* at ¶143.

## IV. Discussion.

### A. Remtron's Motion for Summary Judgment.

Defendant Remtron contends that it is entitled to summary judgment as to the plaintiff's strict liability and negligence claims because, it contends, the record establishes that reckless conduct of the plaintiff was the proximate cause of the accident.

Defendant Remtron contends that the plaintiff acted recklessly in turning off the power to his remote. At his deposition, the plaintiff initially testified that the power to his remote was on the entire time on the day of the accident. *Doc. 95-4* at 62 (Shuman Dep. at 61). After conferring with his counsel and reviewing the allegations in the complaint, however, he testified that he doesn't know whether he turned off his remote. *Doc. 95-4* at 102-104 (Shuman Dep. at 101-103). He then testified that if he had turned off his remote, he would have done so to ensure that the Shuman crane would not move. *Doc. 95-4* at 105 (Shuman Dep. at 104). Plaintiff's

expert opines that “[i]t was reasonable and predictable that an operator would turn off the transmitter to prevent unintended actuation of the switches when handling or dropping the transmitter.” *Doc. 95-9* at 22 (Eckstine Report at 21). There is evidence that a supervisor told the plaintiff to turn off the remote when entering the bins. *Doc. 95-1* at 89-92 & 104-106 (Porter Dep. at 88-91 & 103-105). It is for the trier of fact to determine whether the plaintiff’s conduct in turning off his remote was reckless.

Defendant Remtron also suggests that the plaintiff acted recklessly by raising the bundles too high and by performing the cutting of the bands in the bin rather than in an open area contrary to the policies of his employer. The defendant cites evidence that the plaintiff was told on a number of occasions, including on the morning of the accident, to cut the bands in an open area instead of in the bins. *See Doc. 95-1* at 74-75 & 80 (Porter Dep. at 73-74 & 79). But there was no official policy on how to cut the bands. *See Doc. 95-1* at 75-76 (Porter Dep. at 74-75). There is evidence that the rules and procedures were not clear. *See Doc. 95-1* at 81

(Porter Dep. at 80); *Doc. 95-2* at 134 (Robenolt Dep. at 133); *Doc. 95-4* at 80 (Shuman Dep. at 79). It is for the trier of fact to determine whether the plaintiff's conduct was reckless.

Defendant Remtron contends that it is entitled to summary judgment on the plaintiff's failure-to-warn claim because the record establishes that a lack of warnings was not the proximate cause of the accident. It contends that the plaintiff was aware of the danger of turning off his remote, of the danger of the cutting of the bands inside the bin, and of the danger of lifting the load too high. It contends that there is insufficient evidence that additional warnings would have made any difference. As set forth above, there is evidence that the safety policies and procedures were unclear. Given the lack of clarity, we cannot say as a matter of law that a proper warning would not have made a difference. Also, regardless of whether warnings would have changed the plaintiff's behavior, there is evidence that a warning on the remote control unit telling the operator to be certain that the remote is set to the proper crane would have changed the behavior of Dale Weaver. He testified that he would have

obeyed such a warning. *Doc. 95-3* at 53-54 (Weaver Dep. at 52-53). The proposition that warnings would not have made a difference is not free from genuine dispute.

Defendant Remtron also contends that it is entitled to summary judgment on the failure-to-warn claim based on the sophisticated user doctrine. Defendant Remtron contends that Bouras was a sophisticated user of cranes and remote controls and that it was in the best position to warn its employees of dangers.

Remtron contends that, because Bouras had 15 to 17 cranes in its factory and had purchased ten remote crane operating systems from Friedman Electric and had experience using Remtron remotes, it may reasonably be inferred that Bouras understands the use of cranes and Remtron remote controls and that cranes are critical to the everyday operations of its business. Remtron also asserts that the plaintiff had twenty-two years of experience working in the building that housed the cranes, that he had performed the job

of crane operator for seven months, and that he had received
training on the use of a crane.

All of that may be true, but there is evidence that the
remote control system at issue in this case which allowed two
cranes to be operated by either of two different remotes was
the first such system installed by Bouras.  Thus, we cannot say
as a matter of law that Bouras was a sophisticated user of such
a system.  Neither can it be said that the plaintiff was a
sophisticated user of such a system.  Thus, defendant Remtron
is not entitled to summary judgment on the basis of the
sophisticated user doctrine.

Based on the foregoing, we will deny defendant
Remtron's motion for summary judgment.

B. Friedman Electric's Motion for Summary Judgment.

Third-party defendant Friedman Electric points out that
the plaintiff has not brought suit against it and that the only

claims against it are the indemnification and contribution claims of Remtron. It contends that Remtron cannot prevail on its indemnification and contribution claims.

Under Pennsylvania products liability law, "all suppliers of a defective product in the chain of distribution, whether retailers, partmakers, assemblers, owners, sellers, lessors, or any other relevant category, are potentially liable to the ultimate user injured by the defect." *Burch v. Sears, Roebuck & Co.*, 467 A.2d 615, 621 (Pa.Super.Ct. 1983). "This rule of law ensures the availability of compensation to the injured party, and helps placed the burden of such injury on parties who, unlike the consumer, have a better opportunity to control the defect or spread its costs through pricing." *Id.* But "[t]o further achieve these policies and to do justice among the potential defendants, Pennsylvania permits the remedies of indemnity and contribution so that as among those in the chain of distribution liability may ultimately rest with, or be shared equally among, those who can best detect, control, or prevent the defect." *Id.* at 621-22 (footnote omitted).

Under Pennsylvania law, contribution applies when the parties are joint tortfeasors. *Kirschbaum v. WRGSB Assocs.*, 243 F.3d 145, 156 (3d Cir. 2001). "[J]oint tortfeasors are entitled to contribution if they have paid more than their pro rata share of a common liability." *Rabatin v. Columbus Lines, Inc.*, 790 F.2d 22, 24 (3d Cir. 1986). Joint tortfeasors are "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them." 42 Pa.C.S.A. § 8322. "Under Pennsylvania law, two actors are joint tortfeasors if their conduct 'causes a single harm which cannot be apportioned . . . even though [the actors] may have acted independently.'" *Rabatin, supra,* 790 F.2d at 25 (quoting *Capone v. Donovan*, 480 A.2d 1249, 1251 (Pa.Super.Ct. 1984)). Contribution "is an equitable right based on a common liability to the plaintiff.'" *Walton v. Avco Corp.*, 610 A.2d 454, 461 (Pa. 1992)(quoting *John W. Brown, Jr. Equipment Rental Corp. v. Dickey*, 155 A.2d 836, 838 (Pa. 1959)). Contribution "is not a recovery for the tort, but rather it is the enforcement of an equitable duty to share liability for the wrong done by both

[tortfeasors]." *Swartz v. Sunderland,* 169 A.2d 289, 290 (Pa. 1961).

"Indemnification is 'a fault shifting mechanism.'" *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 174 (3d Cir. 2008)(quoting *Sirianni v. Nugent Bros., Inc.*, 506 A.2d 868, 871 (Pa. 1986)). Indemnity "'shifts the entire loss from one tortfeasor who has been compelled to pay it to the shoulders of another who should bear it instead.'" *Walton, supra,* 610 A.2d at 460(quoting W. Prosser, *Law of Torts* at 310 (4th ed. 1979)). The common law "right of indemnification arises when there is a 'difference between the primary and the secondary liability of two persons each of whom is made responsible by the law to an injured party.'" *Kirschbaum*, *supra,* 243 F.3d at 156 (quoting *Builders Supply Co. v. McCabe,* 77 A.2d 368, 370 (Pa. 1951)). "It is a right which enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable." *Builders Supply Co. v. McCabe,* 77 A.2d 368, 370 (Pa. 1951). "[S]econdary as

distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible.” *Id.*

Remtron contends that its claims for contribution and indemnity are contingent on the outcome of the plaintiff’s claims against it and as such those claims will not accrue until the question of liability is resolved. Federal Rule of Civil Procedure 14(a)(1) allows a defendant/third-party plaintiff to file a complaint against an entity “who is or may be liable to it for all or part of the claim against it.” There is nothing in the Rules that precludes the court from ruling on summary judgment, assuming that there is no genuine factual dispute, that the third-party defendant is not as a matter of law liable to the third-party plaintiff.

Friedman Electric also contends that Remtron cannot prevail on its indemnification and contribution claims because

Remtron designed and manufactured the remotes while Friedman
Electric merely processed the sale.  It contends that since
Remtron (in conjunction with its factory representative J.L.
Souser) designed, selected, and manufactured the remotes
Remtron is primarily liable for any harm to the plaintiff.  On
the other hand, Friedman Electric contends that since it was
merely a member of the chain of distribution it could at most
only be secondarily liable for any harm to the plaintiff.
Thus, it contends, because indemnity is only available from
those who are primarily liable to those who are merely
secondarily liable, Remtron is not entitled to indemnity from
Friedman Electric but rather Friedman Electric would be
entitled to indemnity from Remtron.  It continues that, because
an entity which has a right of indemnity against another entity
is not subject to liability for contribution to that person,
Remtron is also not entitled to contribution from it.

    Remtron contends that questions as to material factual
issues exist regarding Friedman's involvement in the project.
The undisputed material facts are set forth above.  Although
Friedman Electric was the initial contact for the sale and

facilitated the sale, it was Remtron and J.L. Souser which selected, designed, and manufactured the remotes.

The undisputed facts as set forth by the parties in their Local Rule 56.1 statements and responses are that the remotes and receivers were installed by Bouras and that the internal policies of Friedman Electric prohibited its employee, Tom Spangler, from performing any services other than processing sales. *Doc. 69* at ¶¶92 & 95. Remtron points to testimony that Friedman may have been involved in the installation of the remotes. It points to the following testimony of David Masser:

> Q: Were you involved in the installation process.
> A: My maintenance people were, yes.
> Q: Did any outside contractors oversee the installation?
> A. I'm not sure, but I think that I had Tom Spangler in, yes.

*Doc. 95-5* at 14-15 (Masser Dep. at 13-14). It also points to the following testimony of Edward Robenolt:

> Q: ... [W]ere you involved in actually installing the remote controls on the raw stock cranes?
> A: No.

Q: Do you know who did that?
A: I thought it was Friedman Electric.

*Doc. 95-2* at 22 (Robenolt Dep. at 21).

It is not clear that Robenolt's testimony is based on personal knowledge, and Masser's testimony is equivocal. In the face of undisputed facts that the remotes and receivers were installed by Bouras and that Friedman Electric's internal policies prohibited Spangler from performing any services other than processing sales, the equivocal testimony cited by Remtron is not sufficient to create a genuine factual dispute. Moreover, Remtron has not argued that it is entitled to indemnity or contribution because the installation was somehow defective or contributed to the accident.

Although Friedman was the initial contact for the sale and facilitated the sale, it not in genuine dispute that it was Remtron and J.L. Souser who selected, designed, and manufactured the remotes. Accordingly, we conclude that if Remtron were held liable to the plaintiff it would not be entitled to indemnity or contribution from Friedman Electric.

Accordingly, we will grant Friedman Electric's motion for summary judgment as to Remtron's indemnity and contribution claims.[10]

---

10. Friedman Electric argues that it is entitled to summary judgment because the plaintiffs cannot prevail on their claims against defendant Remtron. Because we will grant summary judgment to Friedman Electric on the basis that it cannot be liable to Remtron for indemnity and contribution, we need not consider Friedman Electric's other arguments in support of summary judgment. We note, however, that defendant Remtron indicates in its brief in opposition to Friedman Electric's motion that it joins in those arguments. One of those arguments is that the remotes were not unreasonably dangerous and that the court must make that determination as a matter of law. It cites to *Azzarello v. Black Bros Co., Inc.*, 391 A.2d 1020, 1026 (Pa. 1978). *Azzarello* was decided under Section 402A of the Restatement (Second) of Torts. The United States Court of Appeals of the Third Circuit, however, has recently predicted that Pennsylvania will adopt the Restatement (Third) of Torts §§ 1-2 to replace Section 402A of the Restatement (Second) of Torts. *Covell v. Bell Sports, Inc.*, 651 F.3d 357 (3d Cir. 2011). Unless or until the Pennsylvania Supreme Court either rejects the Restatement (Third) or indicates that it will continue to adhere to Section 402A of the Restatement (Second), we are bound by *Covell.* Since *Azzarello* is based on 402A of the Restatement (Second) of Torts but under *Covell* we must apply the Restatement (Third), it is not clear that it is still appropriate for the court to make the determination as a matter of law whether the remote control system was unreasonably dangerous. Assuming that it were still appropriate, after considering the facts in the light most favorable to the plaintiff and balancing the relevant factors, *see Moyer v. United Dominion Industries, Inc.*, 473 F.3d 532, 538 (3d Cir. 2007), we would likely conclude that the remote control system was unreasonably dangerous.

C. J.L. Souser's Motion for Summary Judgment.

Because we will grant summary judgment in favor of Friedman Electric on Remtron's indemnity and contribution claims, Friedman Electric's claims for indemnity and contribution against J.L. Souser are moot. So, we will grant J.L. Souser's motion for summary judgment.

V. Order.

**IT IS ORDERED** that Remtron's motion (doc. 67) for summary judgment is **DENIED**, that Friedman Electric's motion (doc. 68) for summary judgment is **GRANTED**, and that J.L. Souser's motion (doc. 74) for summary judgment is **GRANTED.** The Clerk of Court shall not enter judgment in favor of Friedman

Electric and J.L. Souser until the conclusion of the case as to all parties.

***/s/ J. Andrew Smyser***
J. Andrew Smyser
Magistrate Judge

Dated: February 1, 2012.